Filed 4/2/13  P. v. Sanchez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

| | |
|---|---|
| THE PEOPLE, | C064103 |
| Plaintiff and Respondent, | (Super. Ct. Nos. SF105530A, SF105530B) |
| v. | |
| RICHARD GARCIA SANCHEZ et al., | |
| Defendants and Appellants. | |

Following a joint trial before separate juries, defendants Richard Garcia Sanchez and Francisco Mendez were convicted of the first degree murder of Sergio Reyes (Pen. Code, § 187, subd. (a)[1]; count 1), with two special circumstances, discharging a firearm from a motor vehicle with the intent to inflict death (§ 190.2, subd. (a)(21)) and being an active participant in a criminal street gang and carrying out the murder to further the activities of the gang (§ 190.2, subd. (a)(22)).  Defendants also were convicted of

---

[1]  Further undesignated section references are to the Penal Code.

1

shooting a firearm from a motor vehicle (former § 12034, subd. (c); count 2)[2]; and active participation in a criminal street gang (§ 186.22, subd. (a); count 4). Mendez alone was convicted of shooting at an inhabited dwelling (§ 246; count 3). As to both defendants, the juries found true allegations a principal intentionally and personally discharged a firearm in the commission of counts 1 and 2 (former § 12022.53, subds. (d) and (e)(1)),[3] and that counts 1 and 2 were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). Sanchez's jury also found true allegations Sanchez intentionally and personally discharged a firearm in the commission of counts 1 and 2 (§ 12022.53, subd. (d)), and Mendez's jury found true and allegation count 3 was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

The trial court sentenced Sanchez to life without the possibility of parole on count 1, plus an additional 25 years to life for personally discharging a firearm and causing death in the commission of the murder, which the court ordered "merged into the life without parole." The court imposed and stayed sentences of 25 years to life on the additional firearm enhancement and a term of life with a minimum parole eligibility of 15 years on the gang enhancement ancillary to count 1. As to count 2, the court imposed and stayed a sentence of 7 years (the upper term), plus two terms of 25 years to life for the firearm enhancements, and 10 years for the gang enhancement. As to count 4, the trial court imposed and stayed a sentence of 3 years (the upper term).

---

[2] Section 12034 was repealed effective January 1, 2012, but was reenacted without substantive change as section 26100. (See *People v. Miller* (2012) 202 Cal.App.4th 1450, 1459.)

[3] Following defendants' convictions the Legislature repealed section 12022.53. A new version took effect on January 1, 2012. (Stats. 2010, ch. 711, §§ 5, 10.) The new version continues section 12022.53 without change, except that, as relevant here, subdivision (d) was revised to correct a cross-reference to former section 12034, subdivisions (c) & (d). We shall refer to the former section as "section 12022.53."

The trial court sentenced Mendez to life without the possibility of parole on count 1, plus 25 years to life for the firearm enhancement, which the court ordered "merged into the life without parole sentence for Count 1." The court imposed and stayed a sentence of life with a minimum parole eligibility of 15 years on the gang enhancement appended to count 1. As to count 2, the trial court imposed and stayed a sentence of 7 years (the upper term), plus 25 years to life for the firearm enhancement, and 10 years for the gang enhancement. As to count 3, the court imposed and stayed a sentence of 7 years (the upper term), plus an additional term of life with a minimum parole eligibility of 15 years for the gang enhancement. As to count 4, the court imposed and stayed a sentence of 3 years (the upper term). The court also imposed various fines and fees, including a $30 court facilities assessment for each offense. (Gov. Code, § 70373.)

Defendants appeal. Sanchez contends the trial court prejudicially erred in (1) including "developmental disability" in the jury instruction on mental competence at his competency hearing, (2) admitting evidence Mendez was present and remained silent when Sanchez made statements implicating himself and Mendez in Reyes's murder, and (3) sentencing him on count 2. Mendez contends the trial court prejudicially erred in (1) allowing testimony to be read to the jury when neither he nor his attorney was present, (2) instructing the jury regarding flight, (3) sentencing him to life without the possibility of parole on count 1 when he was 15 years old at the time of Reyes's murder, and (4) imposing a court facilities assessment. Mendez also joins in Sanchez's claim that the trial court erred in sentencing defendants on count 2.

We shall modify the defendants' sentences on counts 1 and 2 and affirm the judgments as modified.

3

## FACTUAL AND PROCEDURAL BACKGROUND

### I
### The Prosecution

Late on the afternoon of November 15, 2006, Reyes was shot and killed as he walked to the store to get some milk. Reyes's young niece, who was outside at the time, heard gunshots and ran inside and told family members what she had heard. Various family members rushed down the street and discovered Reyes lying in a ditch.

Neighbors telephoned 911 and reported hearing shots fired. A paramedic arrived minutes later. Reyes "took one breath and he was pulseless [*sic*]." He was transported to San Joaquin County Hospital and was pronounced dead at 6:15 p.m. He had been shot three times. Among other things, his left lung and heart were perforated, causing massive bleeding.

After hearing two shots, Flo Ming, who lived near the scene of the shooting, ran outside and observed a car "[back] up, kind of went in the ditch and . . . [pull] out and c[o]me flying down the street in front of [her] house." No shell casings were recovered from the scene, suggesting the weapon used was a revolver.

Law enforcement officers received a tip in August 2007, and on August 16, 2007, searched a residence where Mendez was reportedly staying. When officers arrived, Mendez ran out the back door. He was found hiding inside a "shed area" and taken into custody.

Mendez was interviewed by law enforcement later that same day. Evidence concerning his statements only was presented to his jury. On the day of the shooting, defendants were "cruising around" in their friend Rafael Cruz's car when they came across Reyes. Sanchez, who was driving, pulled over near where Reyes was walking and asked him if he "bang[ed]," and Reyes responded by asking Sanchez the same question. Sanchez pulled out a gun, fired eight shots at Reyes, and took off "to get away." Mendez initially claimed he did not know Sanchez had a gun, but later admitted that Sanchez

4

"didn't have no [*sic*] gun," and that the gun that was used to shoot Reyes, a .22-caliber revolver, belonged to Mendez. Sanchez provided the bullets, which he obtained from his father. Mendez also stated that he had the gun in the glove box of Cruz's car, handed it to Sanchez when they saw Reyes, and told Sanchez, "you shoot him or I shoot him." When asked what happened to the gun after the shooting, Mendez explained that he later threw it out the window of a car during a high speed chase with police, and he assumed it was retrieved by the police.

On August 17, 2007, the day after Mendez was taken into custody, officers searched a residence where Sanchez was reportedly staying. While waiting outside, officers saw Sanchez leave the residence, and they took him into custody.

Sanchez was interviewed later that same day. Evidence concerning his statements only was presented to his jury. Sanchez initially told officers he was with Mendez when Mendez shot Reyes. He explained that he and Mendez had borrowed a gray four-door car from Cruz and were cruising around when they saw Reyes walking down the street. Mendez, who was driving, made a U-turn, pulled alongside Reyes, asked him, "What you bang," and then shot him eight times. Reyes fell to the ground and Mendez "took off." Mendez mistakenly believed Reyes was a Norteño. Sanchez was concerned he would be blamed for the shooting because he loaded the gun, and his finger prints were on the gun and the bullets. Sanchez denied having a gun or shooting at anyone that day.

After a detective advised Sanchez that witnesses had identified him as the driver and Mendez as the passenger, Sanchez admitted he was driving the car, and that he shot Reyes eight times.[4] He explained that Mendez said he wanted "to go shoot some busters"[5] and when Sanchez "rolled up on" Reyes, Mendez handed him the gun, and told

---

[4] The detective acknowledged that this was a ruse, and that witnesses had not actually identified Sanchez as the driver.

[5] "Buster" is a derogatory term for a Norteño.

5

him to shoot. Sanchez told Mendez he did not want to do it, and Mendez told him, "Do it, before I take the gun away and shoot you." Sanchez then shot Reyes eight times "[a]ll over his body" and "took off." Mendez told Sanchez he threw the gun away during a high speed chase with police. Mendez said he was riding in a brown Honda during the chase. Sanchez acknowledged he was a member of Vicky's Town (VST), a Sureño gang, and stated that other gang members threatened to kill him if he did not kill someone.

Later, Sanchez was interviewed a second time while Mendez was present. Mendez was instructed not to speak to Sanchez, and Mendez did as he was instructed. Sanchez again admitted driving Cruz's car and shooting Reyes. When he pulled alongside Reyes, Mendez handed him a .22-caliber revolver and told him to shoot. Sanchez had been a member of VST for seven years.

Cruz's father testified that in November 2006 Cruz drove a gray Ford Taurus. At approximately 11:30 a.m. on November 15, 2006, the day of the shooting, he observed two men arrive at his home, which he shared with Cruz, briefly go inside, and then leave in Cruz's car.

On November 21, 2006, six days after the shooting, law enforcement found a loaded .22-caliber revolver with a nine-round capacity next to the passenger side of a tan or silver Honda that had been involved in a chase with the California Highway Patrol. A ballistics expert testified that that two bullets recovered from Reyes's body most likely were fired from that gun.

On November 30, 2006, two weeks after the shooting, a police officer had a consensual encounter with defendants. Mendez was wearing blue shoes and a blue belt with the number 13 on the buckle and had two Sureño tattoos (the roman numeral XIII and the word "SUR") on his left hand. He said he had been a Sureño for about a year. Sanchez had VST and Sureño tattoos and said he was a Sureño and a member of VST, as was Mendez.

6

A gang expert testified that in 2006, VST consisted of 188 members and was a subset of the Sureño gang in Stockton since 1985. Both are criminal street gangs. They identify with the number 13, the color blue, and the word "Sur." Norteños are their enemies and identify with the color red. Norteños wear a Mongolian hair style (a shaved head with a ponytail in the back), and Sureños usually have shaved heads or close-cut hairstyles. Another gang expert opined that defendants were both active Sureño and VST gang members on the date Reyes was shot, that Reyes's murder was perpetrated for the benefit of, in association with, or at the direction of the Sureño/VST gang, and that Reyes was shot because he was believed to be a Norteño. The expert explained that Reyes's murder would benefit the gang by instilling fear in the community and giving status to the gang and the perpetrator within the gang, even if the victim was not a rival gang member.

## II
### The Defense

Sanchez's defense was that he made a false confession and that Reyes was shot by some Norteños. Sanchez called several witnesses to testify in his defense. Reyes's brother-in-law testified that shortly before the shooting, he saw a Ford Taurus slowly drive past his house, where Reyes was living at the time. There were four occupants, each of whom was wearing a red shirt and a red hat.

Reyes's niece, who was 15 years old at the time of the shooting, also saw a four-door Ford Taurus drive past her home while she and Reyes were outside earlier that day. The driver was a Hispanic man in his twenties with a Mongolian hair style and a red band in his hair. There were two people in the two front seats and three people in the backseat, and the driver appeared to be "mad-dogging" Reyes.

Arthur Gunter, who lived near where the shooting occurred, observed a gray Ford Taurus "flying past" immediately after the shots were fired. There were four Hispanic men in the car and they were all wearing red. He identified Cruz as the driver and

7

directed officers to Cruz's home, where they observed what appeared to be the same gray Ford Taurus Gunter observed after the shooting.

Six months before Reyes was killed, Reyes's cousin witnessed a Norteño confront Reyes and ask Reyes "why he would spray paint [a] 13 in a Norteño area of town."

Mendez did not submit any evidence in his defense. During closing argument, his counsel did not dispute that Mendez was present when Sanchez shot Reyes or that it was his (Mendez's) gun that was used to shoot Reyes; rather, he suggested that Mendez did not know that Sanchez intended to shoot Reyes when he (Mendez) handed him the gun. Mendez's counsel argued that Mendez "should be a witness in this case, not a defendant."

DISCUSSION

I

The Trial Court Properly Instructed the Jury on "Developmental Disability" at Sanchez's Competency Hearing

Sanchez first contends "[t]he trial court erred by including 'developmental disability' in the jury instruction on incompetence, as [he] did not have a developmental disability under state law, and the error misled the jury regarding [his] mental disorder, in violation of [his] fourteenth amendment right to a fair trial of his competence to stand trial." We are not persuaded.

Prior to trial, Sanchez's attorney raised an issue concerning Sanchez's competence to stand trial. The trial court suspended proceedings, appointed Dr. John Chellsen, a clinical psychologist, and Dr. Gary Cavanaugh, a psychiatrist, to evaluate Sanchez, and scheduled a hearing on Sanchez's competency. (§§ 1368, 1369.) A jury found Sanchez competent to stand trial.

Three doctors testified on Sanchez's behalf at the competency hearing. Chellsen concluded Sanchez was incapable of cooperating with counsel. He initially diagnosed Sanchez with "mild mental retardation and mixed specific developmental disorders." One year later, after additional test results were made available, Chellsen determined that

8

his "initial diagnosis . . . of mental retardation was erroneous," and that Sanchez's "overall IQ score [was in] what's called the borderline range, which is somewhere between mentally retarded and low average. And so he would merit the diagnosis [of] learning disorder, not otherwise specified." When asked if "that disorder [is] recognized in the psychiatric and the scientific community," Chellsen responded, "It's a recognized diagnosis. It's not as precise of one as mental retardation or a -- some other major psychiatric disorders, but nonetheless, signifies impairment." During cross-examination, Chellsen was shown a videotape of Sanchez being interviewed by a detective and thereafter observed that Sanchez "may have been less than candid and not evidencing his best interviews with me." Chellsen nevertheless concluded Sanchez was not competent to stand trial.

Dr. Roger Katz, a clinical psychologist retained by Sanchez, also testified on Sanchez's behalf. He evaluated Sanchez in June 2008 and opined that Sanchez was "legally incompetent" at the time of the evaluation. Katz explained that while Sanchez's test scores "fell in the mildly retarded to the borderline range of intelligence," "[t]echnically [he] was not mentally retarded . . . because his nonverbal reasoning and problem solving skills were in the normal range." When asked to explain the difference between mental retardation and a learning disorder, Katz stated, "Basically both mental retardation and a learning disability fall in the general classification of a developmentally [*sic*] disability." On cross-examination Katz was shown evidence of a discussion between Sanchez and his mother regarding a codefendant and the codefendant's plea deal. Katz found such evidence "reflected more of an understanding of the legal situation" than he had previously observed, and that it "move[d] the needle a little bit more in the direction that he might be competent."

Cavanaugh was the third doctor to testify on Sanchez's behalf. Following his initial evaluation, Cavanaugh concluded that Sanchez "was not able to rationally cooperate with his attorney, and . . . not competent" to stand trial. He believed Sanchez's

9

intellectual functioning was "in the mentally retarded range" but was not sure "whether it was a developmental disability . . . or whether it was acquired . . . ." After a follow-up evaluation in August 2008, Cavanaugh determined that Sanchez had improved but was still incompetent to stand trial. Thereafter, Cavanaugh "received a large amount of material from the D.A.'s office," including copies of Sanchez's police interrogations, recordings and transcripts of jail visits, and various letters written to and by Sanchez. After reviewing those materials, Cavanaugh concluded Sanchez was "totally competent."

Dr. Gary Westcott, a clinical psychologist who had worked at Valley Mountain Regional Center (VMRC) from 1986 to June 2007, testified for the prosecution. He explained that mental retardation is a developmental disability. After reviewing a report prepared by another doctor who was affiliated with VMRC, Westcott determined that Sanchez did not meet the diagnostic criteria for support at VMRC. Specifically, he did "not have a developmental disability as defined in California Statute," nor did he meet the criteria "for assigning a diagnosis of mental retardation." Westcott did find that Sanchez "had a very severe language based learning disability . . . ." However, "[p]ersons whose handicapping condition is a result of a learning disability are specifically excluded . . . from Regional Center services, and [Sanchez] was excluded on that basis." "[L]earning disabilities are recognized as disorders . . . ."

During the jury instruction conference, Sanchez, through his counsel, objected to the court instructing the jury in the language of CALCRIM No. 3451 to the extent the instruction referenced "developmental disability," arguing that "[t]here's no evidence of developmental disability," and that he was not contending he had a developmental disability; rather, he was proceeding on the theory that he was incompetent due to a "mental disorder." He also asserted that the instruction was confusing in that it could be interpreted as stating that "developmental disability is a prerequisite to a finding of incompetence, which is not correct." Accordingly, he requested the court omit the language concerning developmental disability in CALCRIM No. 3451. The prosecution

10

opposed the request, noting that Sanchez had "two doctors come in here or he relied upon two doctors that indicated that [he] was mentally retarded."  The trial court found that there was significant evidence that Sanchez is mildly retarded and that the instruction should be given with the developmental disability language intact.  With respect to Sanchez's assertion that the instruction was confusing, the trial court disagreed, noting that the instruction does not state that "you have to have a developmental disability to be incompetent" and explaining that it intended to instruct the jury "that not every instruction applies."

Thereafter, the trial court instructed the jury in the language of CALCRIM No. 3451 as follows:

"You must decide whether the defendant is mentally competent to stand trial. That is the only purpose of this proceeding.

"Do not consider whether the defendant is guilty or not guilty of any crime or whether he was sane or insane at the time of the alleged crime or that any alleged crime was committed.

"The defendant is mentally competent to stand trial if he can do all of the following:

"1. Understand the nature and purpose of the criminal proceedings against him;

"2. Assist, in a rational manner, his attorney in presenting his defense; and

"3. Understand his own status and condition in the criminal proceedings.

"The law presumes that a defendant is mentally competent. In order to overcome this presumption, the defendant must prove that it is more likely than not that the defendant is now mentally incompetent because of a mental disorder or developmental disability.

"A developmental disability is a disability that begins before a person is 18 years old and continues or is expected to continue for an indefinite period of time.  It must be a

11

substantial handicap and does not include other handicapping conditions that are solely physical in nature.

"Examples of developmental disabilities include mental retardation and conditions closely related to mental retardation or requiring treatment similar to that required for mentally retarded individuals."[6]

"A trial court has a duty to instruct on general principles of law that are 'closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case.' " (*People v. Moye* (2009) 47 Cal.4th 537, 554.) Here, there was evidence Sanchez had a developmental disability, and under the circumstances of this case, an instruction addressing that issue was necessary for the jury's understanding of the case.

Chellsen initially diagnosed Sanchez with mild mental retardation and "mixed specific developmental disorders" and later found his overall IQ was somewhere between mentally retarded and low average. While Katz concluded that Sanchez technically was not mentally retarded, he noted that Sanchez's test scores "fell in the mildly retarded to the borderline range of intelligence . . . ." Katz also stated a learning disability, like mental retardation, falls in the general classification of developmental disability. While Sanchez ultimately decided not to argue that he was mentally retarded or otherwise developmentally disabled, given the aforementioned evidence, the trial court did not err in instructing the jury on how to evaluate the evidence presented.

Contrary to Sanchez's assertion, the instruction was not reasonably likely to confuse the jury. Sanchez contends "[t]he inclusion and definition of 'developmental disability' in CALCRIM No. 3451 would confuse a reasonable juror and at a minimum,

---

[6] The challenged language tracks that of the applicable statutes. (See §§ 1367, 1369, 1370.1.)

12

make [his] cognitive defects seem insignificant, as the testimony was clear that [his] deficits did not rise to the level of a developmental disability under state law."

The jury was instructed, consistent with section 1367, that any mental incompetency must be the result of a "mental disorder *or* developmental disability." (Italics added.) "We 'credit jurors with intelligence and common sense' [citation] and presume they generally understand and follow instructions [citation]." (*People v. McKinnon* (2011) 52 Cal.4th 610, 670.) We find that, if anything, the jury would have been confused had the portions of the instruction referring to developmental disability been excised given the evidence presented. We also note that Sanchez was free to argue to the jury that his alleged incompetence stemmed from a mental disorder, and thus, whether he was mentally retarded or otherwise suffered from a developmental disability was not relevant to the jury's determination. Indeed, his counsel did just that.

On this record we have no trouble concluding that the trial court properly instructed the jury regarding "developmental disability" pursuant to CALCRIM No. 3451.

II

Any Potential Error in Admitting Evidence Mendez Was Present During Sanchez's Second Interview with Law Enforcement Was Harmless

Sanchez next contends that the admission of evidence that Mendez was present and remained silent while Sanchez made statements implicating himself and Mendez in Reyes's murder was error under the *Aranda-Bruton* rule (*People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*); *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476] (*Bruton*)), and under the ruling of *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford*) because "any jury would have taken [Mendez's] silence as corroborative of [Sanchez's] statements about the shooting and the involvement of both

13

of them."[7]  More specifically, Sanchez asserts that "Mendez's silence corroborated and endorsed [Sanchez's] confession, which effectively made Mendez a witness against [Sanchez], a witness [Sanchez] was unable to cross-examine because Mendez did not testify at trial."  Sanchez raises an interesting issue; however, we need not reach it because any error in admitting the challenged evidence was harmless under any standard.

During the motions in limine, the prosecutor indicated she intended to introduce a videotape of a "dual interview" of defendants.  She explained that she would edit the videotape such that the Mendez jury would be shown only the dialogue between the detective and Mendez, and the Sanchez jury would only be shown the dialogue between the detective and Sanchez.  Sanchez objected, arguing that "the evidence . . . that the codefendant [Mendez] is present and silent during the . . . dialogue between the detective and [Sanchez] does create an *Aranda Bruton* [issue]."  Sanchez suggested the prosecutor present an audiotape of the interview rather than a videotape.  The trial court disagreed, explaining that *Aranda-Bruton* applies where the codefendant is a declarant, and Mendez is not a declarant.  The court also rejected Sanchez's assertion that Mendez's silence amounted to an adoptive admission.

---

**7**  In *Aranda*, the California Supreme Court observed that when a confession of one defendant incriminates a codefendant, it would not be possible for jurors to consider the confession with respect to the confessing defendant and then ignore the statement with respect to the codefendant.  (*Aranda, supra,* 63 Cal.2d at p. 529.)  Accordingly, the court held that, as a matter of judicial procedure, when a confession of one defendant implicates a codefendant, then the confession must be redacted to eliminate references to the codefendant, or the confession must be excluded from evidence, or separate trials must be granted.  (*Id.* at p. 530.)  In *Bruton*, the United States Supreme Court held that the introduction of a confession of a defendant that implicates a codefendant violates the codefendant's constitutional right of cross-examination even if the jury is instructed to disregard the confession in determining the codefendant's guilt or innocence.  (*Bruton, supra,* 391 U.S. at p. 137 [20 L.Ed.2d at p. 485].)  *Crawford* precludes the introduction of out-of-court testimonial statements unless the witness is unavailable and the defendant previously had an opportunity for meaningful cross-examination.  (*Crawford, supra,* 541 U.S. at p. 59 [158 L.Ed.2d at p. 197].)

14

We need not decide whether the trial court erred in admitting the challenged evidence because any error was harmless beyond a reasonable doubt. (*People v. Jennings* (2010) 50 Cal.4th 616, 652.) Prior to the dual interview, Sanchez gave a detailed confession in which he admitted driving the car and shooting Reyes. Moreover, details of his confession were corroborated by other evidence concerning the type of gun used (a .22-caliber revolver), what became of the gun (recovered following a high speed chase involving a brownish Honda), and the car used in the shooting (Cruz's gray Ford Taurus). On this record, we conclude beyond a reasonable doubt that the jury would have rejected Sanchez's false confession defense and reached the same verdict had it not learned that Mendez was present and remained silent during the second interview at which Sanchez again confessed to driving the car and shooting Reyes. This is particularly true where, as here, the prosecutor did not comment on Mendez's silence at anytime.

III

Defendants' Sentences on Count 2 Must Be Modified

Defendants each contend their sentences for the gang enhancement on count 2 should be reduced from 10 to 5 years. Sanchez also contends that the trial court should have stayed one of the 25-year-to-life firearm enhancements on count 2 pursuant to section 12022.53, subdivision (f). We agree with both contentions and further find as to Mendez only that the trial court should have stayed the gang enhancement on count 2 pursuant to section 12022.53, subdivision (e)(2).

As previously discussed, both defendants were convicted in count 2 of shooting a firearm from a vehicle pursuant to former section 12034, subdivision (c). As to Sanchez, the trial court imposed the upper term of 7 years, plus two terms of 25 years to life for the section 12022.53, subdivision (d) and subdivisions (d) and (e) enhancements, and 10 years for the section 186.22, subdivision (b)(1) enhancement. As to Mendez, the trial

15

court imposed the upper term of 7 years, plus 25 years to life for the section 12022.53, subdivisions (d) and (e) enhancement, and 10 years for the section 186.22, subdivision (b)(1) enhancement.  The court then stayed both defendants' sentences on count 2 pursuant to section 654.

The gang enhancement statute, section 186.22, subdivision (b)(1), provides in part as follows:

"Except as provided in paragraphs (4) and (5), any person who is convicted of a felony committed for the benefit of . . . any criminal street gang . . . shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished as follows:

"(A) Except as provided in subparagraphs (B) and (C), the person shall be punished by an additional term of two, three, or four years at the court's discretion.

"(B) If the felony is a serious felony, as defined in subdivision (c) of Section 1192.7, the person shall be punished by an additional term of five years.

"(C) If the felony is a violent felony, as defined in subdivision (c) of Section 667.5, the person shall be punished by an additional term of 10 years."

Because the jury found that defendants violated section 12022.53 in the commission of count 2, count 2 is a "violent" felony within the meaning of section 667.5, subdivision (c)(22) (designating "[a]ny violation of Section 12022.53" as a "violent felony").  Therefore, under section 186.22, subdivision (b)(1)(C), as the trial court found, the additional punishment would be a fixed term of 10 years.

However, section 1170.1, subdivision (f) provides:  "When two or more enhancements may be imposed for being armed with or using a dangerous or deadly weapon or a firearm in the commission of a single offense, only the greatest of those enhancements shall be imposed for that offense.  This subdivision shall not limit the

16

imposition of any other enhancements applicable to that offense, including an enhancement for the infliction of great bodily injury."

In *People v. Rodriguez* (2009) 47 Cal.4th 501, 508-509, our Supreme Court held that where a defendant is subject to a firearm enhancement and a gang enhancement based on the use of a firearm, section 1170.1, subdivision (f) precludes imposition of both enhancements.

Here, defendants became eligible for the 10-year gang enhancement *only* because of Sanchez's firearm use, which use was charged and proved as provided in section 12022.53. (§ 667.5, subd. (c)(22).) Thus, the firearm use resulted in additional punishment not only under section 12022.53, but also under section 186.22, subdivision (b)(1)(C). Based on the application of section 1170.1, subdivision (f), as interpreted by our Supreme Court in *Rodriguez, supra,* 47 Cal.4th at pages 508-509, defendants should have been sentenced to 5 years (not 10) for the gang enhancement (the punishment for the enhancement absent the firearm element). (§ 186.22, subd. (b)(1)(B) [providing for an additional five year term if the felony is "serious," as defined in § 1192.7, subd. (c)]; 1192.7, subd. (c)(36) [making § 26100 (former § 12034) a serious felony].) We shall modify defendants' sentences on count 2 accordingly.

We reject the People's suggestion that no modification is necessary because the trial court stayed defendants' sentences on count 2 pursuant to section 654. As Sanchez points out, should defendants' convictions on count 1 be overturned at some point in the future, their sentences on count 2 would no longer be stayed. Thus, the modification sought here could have real significance.

Sanchez also asserts that "the [trial] court should have stayed one 25-year-to-life firearm enhancement under section 12022.53, subdivision (f)." That subdivision provides in pertinent part: "Only one additional term of imprisonment under this section shall be imposed per person for each crime. If more than one enhancement per person is found true under this section, the court shall impose upon that person the enhancement

17

that provides the longest term of imprisonment." Here, the trial court imposed two 25-year-to-life terms under section 12022.53, subdivision (d) and subdivisions (d) and (e) in sentencing Sanchez on count 2. One of those sentences must be stayed pursuant to section 12022.53, subdivision (f). (See *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1126, 1129 ["the words 'impose' and 'imposed,' as used throughout subdivision (f) [of section 12022.53] . . . mean impose and then execute," and "the Legislature intended the trial court to stay, rather than strike, prohibited enhancements under section 12022.53"].) As previously discussed, this is so even though the entire sentence on count 2 was stayed pursuant to section 654 because in the event Sanchez's conviction on count 1 is overturned the sentence on count 2 will be executed.

While not raised by Mendez, we note that section 12022.53, subdivision (e)(2) provides in pertinent part: "An enhancement for participation in a criminal street gang . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense." Here, the prosecution did not allege and the jury did not find that Mendez personally used or personally discharged a firearm in the commission of count 2. Accordingly, his sentence for the gang enhancement on count 2 must be stayed pursuant to section 12022.53, subdivision (e)(2).

We shall reduce defendants' sentences for the gang enhancement on count 2 from 10 to 5 years, stay Sanchez's sentence for the section 12022.53, subdivisions (d) and (e)(1) firearm enhancement on count 2 pursuant to section 12022.53, subdivision (f), and stay Mendez's sentence for the gang enhancement on count 2 pursuant to section 12022.53, subdivision (e)(2).

IV

The Trial Court's Handling of the Jury's Readback Request Did Not Violate Mendez's Constitutional Rights and Any Possible Violation of His Statutory Rights Was Harmless

Mendez contends the trial court deprived him of his federal and state constitutional rights to due process and the presence of counsel and violated his statutory rights under sections 977 and 1138 when it allowed testimony to be read back to the jury when neither he nor his attorney was present. As we shall explain, there was no violation of Mendez's constitutional rights and any possible violation of his statutory rights was harmless.

During deliberations, the jury requested a readback of Ming and Gunter's testimony. The trial court advised the parties of the request and asked if Mendez was willing to waive his appearance. Mendez responded that he was not willing to waive his appearance. Citing *People v. McCoy* (2005) 133 Cal.App.4th 974, the trial court advised Mendez that he did not have a right to be present and indicated its intent to send the court reporter into the jury room to read the requested testimony. Prior to doing so, the court admonished jurors that they could speak to the court reporter "only for one purpose and that is concerning the mechanics of reading [the testimony] back. In other words, 'Could you read that again? Could you say that word again?' But do not, obviously you can't say, 'What did the witness mean by that? That's for the jury to decide."

The United States Supreme Court has never held that allowing a readback of witness testimony outside the presence of a defendant and his attorney is a violation of the federal Constitution. (See *People v. McCoy, supra*, 133 Cal.App.4th at p. 982.) California Supreme Court decisions that have considered the issue have uniformly held there is no federal or state constitutional violation when a readback occurs outside the presence of a defendant or his attorney. (*Id.* at pp. 982-983; citing, e.g., *People v. Cox* (2003) 30 Cal.4th 916, 963 ["rereading of testimony is not a critical stage of the proceedings"], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22, and *People v. Pride* (1992) 3 Cal.4th 195, 251 [no violation of a defendant's

19

rights to counsel and due process even though "no one was present (the court, counsel, or defendant) to monitor or report the readback"].) The fact that Mendez refused to "waive his appearance" at the readback does not change the equation. While the better practice would have been to conduct the readback in Mendez's presence given his apparent desire to be present, there was no constitutional violation in the court's failure to do so.

Mendez also asserts that the readback of testimony here violated his statutory rights under sections 977 and 1138.

Section 977 provides in pertinent part: "In all cases in which a felony is charged, the accused shall be present at the arraignment, at the time of plea, during the preliminary hearing, during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence. The accused shall be personally present at all other proceedings unless he or she shall, with leave of court, execute in open court, a written waiver of his or her right to be personally present . . . ." (§ 977, subd. (b)(1).)

Mendez's absence from the readback of the witnesses' testimony violated section 977, subdivision (b)(1), because Mendez did not execute in open court a written waiver of his right to be personally present. (*People v. Avila* (2006) 38 Cal.4th 491, 598.) "But the error was 'statutory only and thus "is reversible only if it is reasonably probable the result would have been more favorable to defendant absent the error." [Citation.]' [Citation.] Because [Mendez] provides no basis on which we could conclude the result of his trial would have been different had he [or his counsel] been present at the readback [citation], we find the violation of section 977 was harmless." (*Ibid.*)

Section 1138 provides, "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." "Although the primary concern of section 1138 is the *jury's* right to

20

be apprised of the evidence, a violation of the statutory mandate implicates a defendant's right to a fair trial conducted ' "substantially [in] accord[ance with] law." ' [Citations.]" (*People v. Frye* (1998) 18 Cal.4th 894, 1007, overruled on other grounds in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn 22.) As previously discussed, however, the trial court's handling of the readback did not violate Mendez's right to a fair trial, and any violation of his statutory rights was harmless.

V

The Trial Court Properly Instructed the Jury on Flight

Mendez next contends the flight instruction given by the trial court (CALCRIM No. 372) impermissibly lowered the burden of proof and was not supported by substantial evidence. We disagree with both contentions.

"On review, we examine the jury instructions as a whole, in light of the trial record, to determine whether it is reasonably likely the jury understood the challenged instruction in a way that undermined the presumption of innocence or tended to relieve the prosecution of the burden to prove defendant's guilt beyond a reasonable doubt." (*People v. Paysinger* (2009) 174 Cal.App.4th 26, 30.)

Over Mendez's objection, the trial court instructed the jury with CALCRIM No. 372 as follows: "If the defendant fled immediately after the crime was committed, or after he was accused of committing the crime, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, the evidence that the defendant fled or tried to flee cannot prove guilt by itself."

Mendez asserts "the flight instruction undermined the presumption that [he] lacked the requisite mental state and thereby relieved the prosecution of the burden to prove the offenses beyond a reasonable doubt and deprived [him] of a jury verdict" because it presumes the crime was committed. He also observes that "CALCRIM No. 372 varies significantly from the flight instruction contained within Penal Code section 1127c." We

21

rejected identical arguments in *People v. Paysinger, supra,* 174 Cal.App.4th at pages 30-31, and see no reason to revisit that decision here.

Mendez also asserts there was no substantial evidence to support giving the flight instruction because "[m]erely being driven from the scene" did not constitute flight, and "[g]iven the frequency of [his] contact with law enforcement officers his flight [eight months after the shooting] cannot logically be attributed to a consciousness of guilt for the shooting . . . ."

" 'In general, a flight instruction "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt." ' [Citations.] Evidence that a defendant left the scene is not alone sufficient; instead, the circumstances of departure must suggest 'a purpose to avoid being observed or arrested.' [Citations.] To obtain the instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury could find the defendant fled and permissibly infer a consciousness of guilt from the evidence. [Citation.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 328.)

Here, the record supported the inferences for the flight instruction. Neighbors reported hearing tires squealing and seeing a car "flying down the street" immediately after the shooting. Mendez himself told officers that after the shooting, he and Sanchez took off "to get away." That Mendez was not driving the car was a fact for the jury to weigh in light of the permissive language of the instruction. Moreover, the circumstances gave rise to an inference of consciousness of guilt. Mendez did not attempt to help Reyes, nor did he attempt to call for or seek assistance. From this evidence, the jury could conclude that the circumstances of Mendez's departure evidenced his guilt as an aider and abettor in the shooting. (*People v. Abilez* (2007) 41 Cal.4th 472, 521-522 [jury can infer guilt when defendant chose not to stay in house where victim killed]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1226 [the jury reasonably may infer guilt from evidence that the defendant ran from the scene of the murder down the street to a vehicle and then

22

drove home], abrogated on other grounds as stated in *McGee v. Kirkland* (C.D. Cal. 2009) 726 F. Supp. 2d 1073, 1080.)

There was also evidence Mendez fled out the back door of his home and hid in the backyard when law enforcement arrived to execute a search warrant several months after the shooting.  To the extent evidence was presented that would support a finding that Mendez fled was for reasons unrelated to Reyes's shooting, those were facts for the jury to consider in determining the meaning of Mendez's conduct.[8]

On this record, the jury reasonably could infer that Mendez's flight from the scene of the crime or from his home when law enforcement arrived to execute a search warrant reflected consciousness of guilt.  (*People v. Abilez, supra*, 41 Cal.4th at p. 522.)

In any event, any possible error was manifestly harmless. The instruction did not figure in the prosecutor's closing argument.  Moreover, the instruction did not posit the existence of flight; both the existence and significance of flight were left to the jury.  (See *People v. Crandell* (1988) 46 Cal.3d 833, 870.)  It is not reasonably probable a verdict more favorable to Mendez would have resulted had the instruction not been given.  (*Ibid.*)

---

[8] Mendez's assertion that "the trial court should have fashioned the instruction . . . to make it clear that . . . any consciousness [of guilt] may have flowed from the commission of other offenses" is not well taken.  Jurors were properly instructed that it was up to them to decide whether Mendez fled or tried to flee, and that if they concluded that he had, it was up to them "to decide the meaning and importance of that conduct."  To the extent Mendez offered evidence that he ran out the back door of his home when law enforcement arrived for reasons unrelated to Reyes's shooting, those were circumstances for the jury to consider in evaluating the meaning and importance of his conduct.

## VI
## Defendants' Sentences on Count 1 Must Be Modified

Mendez contends, and the People concede, that his sentence of life without the possibility of parole on count 1 for the special circumstance murder of Reyes is unauthorized because he was just 15 years old at the time of the shooting. We agree.[9]

Section 190.5 provides in pertinent part: "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances enumerated in Section 190.2 or 190.25 has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life." (§ 190.5, subd. (b).) However, "[f]or juveniles under 16 who were 14 or 15 when the crime was committed, a life term without possibility of parole is not permitted, leaving a term of 25 years to life *with* possibility of parole." (*People Demirdjian* (2006) 144 Cal.App.4th 10, 17.)

Mendez was 15 years old at the time of the murder. Accordingly, his sentence of life without the possibility of parole is unauthorized. The People request that "the case be remanded for resentencing, thus giving the trial court an opportunity to reevaluate the sentence in accordance with section 190.5." We see no need to remand the case because the 25-year-to-life sentence on the substantive offense as well as the 25-year-to-life sentence on the firearm enhancement are mandatory.

In addition, we directed the parties to submit supplemental letter briefs addressing whether the trial court erred when it "merged" defendants' sentences of 25-year-to-life

---

[9] Because we conclude that the life without the possibility of parole sentence is unauthorized we need not address Mendez's additional argument that the sentence constitutes cruel and unusual punishment.

for the firearm enhancement into the sentence for the substantive offense on Count 1. All responded that the trial court had erred and that defendants' sentences for the firearm enhancement should have been imposed consecutively. We agree. First, the merger doctrine does not apply to enhancements. (See *People v. Sanders* (2003) 111 Cal.App.4th 1371, 1373-1374.) Moreover, section 12022.53, subdivision (d) expressly provides that the defendant "shall be punished by an *additional and consecutive term of imprisonment* in the state prison for 25 years to life." (Italics added; see also Cal. Rules of Court, rule 4.405(3) [defining "enhancement" as "an additional term of imprisonment added to the base term"]; see also *People v. Kim* (2011) 193 Cal.App.4th 1355, 1362-1363 [holding that section 12022.53, subdivision (d) "triggers a *mandatory* consecutive 25-year-to-life sentence," which the trial court has no discretion to modify].)

Accordingly, we shall modify Mendez's sentence on count 1 in pertinent part as follows: 25 years to life in state prison for the special circumstance murder, plus a consecutive 25 years to life for the section 12022.53, subdivisions (d) and (e) enhancement. We shall modify Sanchez's sentence on count 1 in pertinent part as follows: life without the possibility of parole for the special circumstance murder, plus a consecutive 25 years to life for the section 12022.53, subdivision (d) enhancement.

VI

The Trial Court Properly Imposed a Court Facilities Assessment Pursuant to Government Code Section 70373

Finally, Mendez contends the trial court erred in imposing a court facilities assessment because the statute authorizing the assessment, Government Code section 70373, was enacted after the date of his crimes. We disagree.

Government Code section 70373, provides in pertinent part: "To ensure and maintain adequate funding for court facilities, an assessment shall be imposed on every conviction for a criminal offense, including a traffic offense . . . . The assessment shall be imposed in the amount of thirty dollars ($30) for each misdemeanor or felony and in

25

the amount of thirty-five dollars ($35) for each infraction." (Gov. Code, § 70373, subd. (a)(1), added by Stats. 2008, ch. 311, § 6.5.) The effective date of the statute is January 1, 2009. (See Stats. 2008, ch. 311.)

Mendez committed the subject crimes on November 15, 2006. The jury convicted him on December 7, 2009. As part of his sentence, the trial court imposed a $120 court facilities assessment ($30 for each of his four felonies).

We previously rejected a claim that this assessment violates ex post facto principles, finding "the assessment is not punitive because it was adopted as one component of the effort to address a budget shortfall; it is not denominated a "fine"; the amount per conviction is small; and the amount is not dependent on the seriousness of the offense." (*People v. Castillo* (2010) 182 Cal.App.4th 1410, 1413; see also *People v. Lopez* (2010) 188 Cal.App. 4th 474, 479; *People v. Fleury* (2010) 182 Cal.App.4th 1486, 1492–1494; *People v. Davis* (2010) 185 Cal.App.4th 998, 1000–1001; *People v. Phillips* (2010) 186 Cal.App.4th 475, 477–479.) We see no reason to revisit those decisions here.

Because Mendez was convicted following the enactment of the statute, the trial court properly ordered him to pay the assessment.

### DISPOSITION

Sanchez's sentence is modified as follows: on count 1, life without the possibility of parole, plus a consecutive 25 years to life for the firearm enhancement under section 12022.53, subdivision (d), plus an additional 25 years to life for the firearm enhancement under section 12022.53, subdivisions (d) and (e), stayed pursuant to section 654, plus an additional term of life with a minimum parole eligibility of 15 years for the gang enhancement, stayed pursuant to section 654. As to count 2, the upper term of 7 years, plus a consecutive 25 years to life for the firearm enhancement under section 12022.53, subdivision (d), plus an additional 25 years to life for the firearm enhancement under section 12022.53, subdivisions (d) and (e), plus 5 years for the gang enhancement. Then entire sentence on count 2 is stayed under section 654, and the

firearm enhancement under section 12022.53, subdivisions (d) and (e) is also stayed under section 12022.53, subdivision (f). As to count 4, the upper term of 3 years, stayed pursuant to section 654. The judgment is affirmed as modified.

Mendez's sentence is modified as follows: on count 1, 25 years to life, plus a consecutive 25 years to life for the firearm enhancement under section 12022.53, subdivisions (d) and (e), plus an additional term of life with a minimum parole eligibility of 15 years for the gang enhancement, stayed pursuant to section 654. As to count 2, the upper term of 7 years, plus an additional 25 years to life for the gang enhancement under section 12022.53, subdivisions (d) and (e), plus 5 years for the gang enhancement. The entire sentence on count 2 is stayed pursuant to section 654 and the firearm enhancement is also stayed under section 12022.53, subdivision (e)(2). As to count 3, the upper term of 7 years, plus an additional term of life with a minimum parole eligibility of 15 years for the gang enhancement. As to count 4, the upper term of 3 years. The entire sentences on counts 3 and 4 are stayed under section 654. The judgment is affirmed as modified.

The trial court is directed to prepare amended abstracts of judgment to reflect these modifications and to forward copies of the same to the California Department of Corrections and Rehabilitation.


       BLEASE       , Acting P. J.


We concur:


   NICHOLSON   , J.


   ROBIE   , J.